UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------

UNITED STATES OF AMERICA, *ex rel.*
DAVID HEISLER; and THE STATE OF NEW
YORK, *ex rel.* DAVID HEISLER

**FIRST AMENDED
COMPLAINT**

Plaintiff,

13 Civ. 4261 (RA) (SN)

-against-

VNSNY CHOICE; VNSNY CHOICE COMMUNITY
CARE; THE VISITING NURSE SERVICE OF
NEW YORK; and CHRISTOPHER PALMIERI,

Defendants.

------------------------------------------------------------------

Plaintiffs the United States, the State of New York and Relator David Heisler, by and

through their undersigned counsel hereby allege for their First Amended Complaint against

defendants VNSNY CHOICE, VNSNY CHOICE Community Care, The Visiting Nurse Service

of New York ("VNSNY"), and Christopher Palmieri (collectively "Defendants") as follows:

## INTRODUCTION

1.      This is an action filed by Relator David Heisler on behalf of the United States,

and the State of New York, under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") and

the New York False Claims Act, N.Y. Fin. Law § 187 *et seq.* ("NYFCA"), to recover money

damages and civil penalties arising from false statements and false claims knowingly submitted

or knowingly caused to be submitted to the federal government by Defendants.

2.      VNSNY and its affiliated entities provide Medicaid managed long-term health

care services to tens of thousands of Medicaid beneficiaries in New York City.  Pursuant to

federal and state law and their contract with the New York State Department of Health,

Defendants are obligated to provide these services, including assistance with activities of daily

living, skilled nursing services, physical, speech and occupational therapy, and nursing home

care at a fixed, capitated rate to beneficiaries meeting certain eligibility requirements, including requiring certain services, such as home health aide or personal care services, for at least 120 days from the effective date of enrollment.

3.    Since approximately 2009, when Palmieri became President of VNSNY CHOICE, VNSNY CHOICE has increased its income from $450 million to $1 billion by engaging in a number of fraudulent schemes.

4.    For example, Defendants hired salespeople who set up marketing stations on the street in certain neighborhoods and improperly and unlawfully solicited individuals passing by. Defendants' salespeople induced Medicaid beneficiaries to join Defendants' Medicaid managed long-term health care plans by offering them incentives such as cash, telephone calling cards, and out-of-town trips, and by making false promises to provide additional and unnecessary hours of home health aide services.

5.    In addition, Defendants unfairly and unlawfully increased their profits by engaging in unlawful cherry-picking – enrolling healthy members who do not meet the eligibility requirements and disenrolling sicker members who need additional health care services. To that end, Defendants' salespeople would target for enrollment healthy individuals, who were not eligible for nursing home level of care and, therefore did not meet the eligibility requirements. These individuals included college students, individuals who travelled frequently, and individuals running home businesses. In contrast, Defendants took steps to disenroll members who requested additional home health aide hours or were about to be discharged from a sub-acute stay. To this end, Defendants would instruct social workers and nurse case managers to initiate discussions to disenroll members who would require 24-hour home health care.

# PARTIES

6.       Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS"), which, through the Centers for Medicare and Medicaid Services ("CMS"), is responsible for administering the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (Act), 42 U.S.C. §§ 1395 et seq. ("Medicare"), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

7.       Plaintiff New York State, acting through the Department of Health (DOH) is responsible for administering the New York State Medicaid program.

8.       Relator David Heisler ("Heisler") is a citizen of the State of New York and brings this action on behalf of the United States of America pursuant to the private action provisions of the FCA, 31 U.S.C. § 3730(b) and on behalf of the State of New York pursuant to the private action provisions of the NYFCA, N.Y. Fin. Law § 190(2). Relator is a licensed clinical social worker and was employed as a social worker by Defendants in 2005 and from April 4, 2011 through January 6, 2012.

9.       Defendant The Visiting Nurse Service of New York is a non-profit company, with offices at 5 Penn Plaza, 12th Floor, New York, New York 10001, organized to provide home and community-based health care and supportive services. VNSNY provides non-monetary support to its affiliated organizations, including VNSNY CHOICE and VNSNY CHOICE Community Care, including administrative, management, and policy-setting functions and fundraising activities.

10.      Defendant VNSNY CHOICE is a non-profit subsidiary of VNSNY, with offices located at 5 Penn Plaza, 12th Floor, New York, New York 10001. VNSNY CHOICE provides

capitated programs that arrange and manage long term health care services, including in New York City.

11.    Defendant VNSNY CHOICE Community Care is a non-profit subsidiary of VNSNY CHOICE, with offices located at 1630 East 15th Street, 3rd Floor, Brooklyn, New York 11229. VNSNY CHOICE Community Care provides home and community-based services that support the activities of VNSNY CHOICE.

12.    Defendant Christopher Palmieri is President of VNSNY CHOICE and resides at 146 Hitching Post Lane, Yorktown Heights, NY 10598.

## JURISDICTION AND VENUE

13.    This court has jurisdiction over this action under 31 U.S.C. § 3732(a) & (b), and 28 U.S.C. § 1331 & 1367.

14.    Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) in that at least one of the defendants can be found, resides and/or transacts business in this District and in that a substantial number of the false claims at issue were submitted or caused to be submitted in this District.

## STATUTORY FRAMEWORK

### A.    The False Claims Act

15. The False Claims Act (FCA) provides, in pertinent part, that:

(a)  Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . . is liable to the United States Government . . . .

4

*  *  *

(b)     For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

16.     Any person who violates the False Claims Act is liable to the United States for up to three times the amount of damages sustained by the federal government and civil penalties of between $5,500 and $11,000 for each claim submitted to the United States.

**B.     The New York False Claims Act**

17.     The NYFCA provides, in pertinent part, that any person who:

(a)  knowingly presents, or cause to be presented a false or fraudulent claim for payment or approval;

(b)  knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(c)  conspires to commit a violation of paragraph (a), (b) . . . of this subdivision;

*       *       *

shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

N.Y. Fin. L. § 189(a).

18.     "Knowing and knowingly" means that a person, with respect to information:

(i)  has actual knowledge of the information;
(ii)  acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

N.Y. Fin. L. § 188(3).

19.    "State" means "the state of New York and any state department, board, bureau, division, commission, committee, public benefit corporation, public authority, council, office or other governmental entity performing a governmental or proprietary function for the state." N.Y. Fin. L. § 188(9).

20.    "Local government" means "any New York county, city, town, village, school district, board of cooperative educational services, local public benefit corporation or other municipal corporation or political subdivision of the state, or of such local government." N.Y. Fin. L. § 188(6).

## C.    The Medicare Program

21.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426A.

22.    HHS is responsible for the administration and supervision of the Medicare Program. CMS, formerly known as the Health Care Financing Administration, is an agency of HHS and directly responsible for the administration of the Medicare program.

23.    The Medicare Program has several parts, one of which, commonly referred to as "Medicare Part A," authorizes payments for institutional care, including, hospital, skilled nursing facility, and home health care. 42 U.S.C. §§ 1395c-1395i-4.

24.    Medicare Part B covers physician services as well as a variety of "medical and health services," including durable medical equipment and supplies.

25.     In addition to other limitations on coverage, Medicare covers only those services that are "reasonable and necessary." 42 U.S.C. § 1395(a)(1)(A).

    **i.**    **Medicare Part A**

26.     To participate in the Medicare program, a provider must file a provider agreement with the Secretary of HHS ("Secretary"). 42 U.S.C. § 1395(cc). The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation in the program. *Id.*

27.     Form CMS-855A is the Enrollment Application for institutional providers. All providers, including VNSNY and its subsidiaries, execute this form in order to participate in Medicare. As part of completing the CMS-855A, a certification must be executed, which reads in pertinent part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the providers compliance with all applicable conditions of participation in Medicare.

28.     To assist in the administration of Medicare Part A, CMS contracts with entities known as "fiscal intermediaries." 42 U.S.C. § 1395h; *see* 42 C.F.R. Part 421, Subparts A and B.

29.     The rules governing the Medicare Program are set forth in the statute (the "Medicare Act"), regulations, and the manuals, rulings and other policy statements issued by CMS.

30.     The Secretary, acting through the fiscal intermediaries, reimburses providers in

accordance with the laws and HHS regulations governing the Medicare program.  42 U.S.C. §

1395h.

    ii. **Medicare Part B**

31.     Medicare Part B covers physician services and a variety of "medical and health

services."

32.     42 C.F.R. § 410.20(a) defines "physician services" as services that are furnished:

(i) Personally by another physician who is a member of the referring physician's
group practice or is a physician in the same group practice (as defined at
§ 411.351) as the referring physician; or

(ii) Under the supervision of another physician who is a member of the referring
physician's group practice or is a physician in the same group practice (as defined
at § 411.351) as the referring physician, provided that the supervision complies
with all other applicable Medicare payment and coverage rules for the physician
services.

33.     To assist in the administration of Medicare Part B, CMS contracts with "carriers."

Carriers, typically insurance companies, are responsible for processing and paying claims.

34.     Providers are required to submit Medicare Part B claims to the carrier for

payment on HCFA Form 1500, which provides, in pertinent part:  "This is to certify that the

foregoing information is true, accurate and complete.  I understand that payment and satisfaction

of this claim will be from Federal and State funds, and that any false claims, statements, or

documents, or concealment of a material fact, may be prosecuted under applicable federal or

State laws."  42 C.F.R § 424.32.

35.     Upon information and belief, HCFA Form 1500 forms were submitted by

VNSNY for physical therapy and other services provided to Medicare-eligible beneficiaries

enrolled in VNSNY CHOICE's managed long-term care.

36.     Both Medicare Part A and Part B pay 100 percent of the cost for Medicare-covered physical therapy provided in the home by a home healthcare agency, like VNSNY and its affiliated companies.

**D.     The Medicaid Program**

37.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching federal funds and ensuring that states comply with minimum standards in the administration of the program.

38.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 *et seq.*

39.     To participate in the Medicaid program, a state must develop a plan that is approved by the Secretary of Health and Human Services as meeting federal requirements. The state pays qualified providers for furnishing necessary services covered by the state plan to individuals who are eligible for medical assistance. The federal government contributes a proportion of the costs that each participating state incurs in purchasing items and services from qualified providers on behalf of eligible persons. The state bears the remainder of the costs.

40.     In New York, providers participating in the Medicaid program submit claims for services rendered to beneficiaries to the New York State Department of Health for payment.

41.     Pursuant to Title 19, section 1932 of the Social Security Act, in or about 1997, New York established a Medicaid managed long-term care (MMLTC) program.

9

MMLTC plans receive a monthly premium of approximately $3800 for each beneficiary they enroll.

42. In return for this premium, MMLTC providers are required to provide, among other things, assistance with activities of daily living, care management services, skilled nursing services, physical therapy, speech therapy, occupational therapy, nursing home care, and preventive services such as dentistry, optometry, and podiatry.

43. New York State Medicaid regulations explicitly prohibit Medicaid providers from seeking reimbursement for services rendered to beneficiaries obtained through payment of referral fees.

44. In particular, 18 N.Y.C.R.R. § 504.6(d) requires that a provider submit Medicaid claims only for services provided in compliance with Title 18 of the Official Compilation of Code, Rules and Regulations of New York State. 18 N.Y.C.R.R. § 515.2(b) prohibits as an "unacceptable practice":

> (5) Bribes and Kickbacks . . . (i) soliciting or receiving either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for referring a client to a person for any medical care, services or supplies for which payment is claimed under the program[; and]

> \* \* \*

> (iii) offering or paying either directly or indirectly any payment (including any kickback, bribe, referral fee, rebate or discount), whether in cash or in kind, in return for referring a client to a person for any medical care, services or supplies for which payment is claimed under the program.

45. 18 N.Y.C.R.R. § 515.2(a) also specifically prohibits as an "unacceptable practice" conduct that is contrary to:

> (3) the official rules and regulations of the Departments of Health, Education and Mental Hygiene, including the latter department's offices and divisions, relating to standards for medical care and services under the program; or

(4) the regulations of the Federal Department of Health and Human Services promulgated under title XIX of the Federal Social Security Act.

46.     Title 18 further provides that "no payments will be made to or on behalf of any person for the medical care, services or supplies furnished . . . in violation of any condition of participation in the program." 18 N.Y.C.R.R. § 515.5(a), (b), and that Medicaid payments may be withheld "when [the Department] has reliable information that a provider is involved in fraud or willful misrepresentation involving claims submitted to the program," *id.* at § 518.7(a).

47.     To receive reimbursement from Medicaid in New York State, all providers who participate in electronic billing, must sign a Certification Statement for Provider Utilizing Electronic Billing (the "Medicaid Electronic Certification") every year. The Medicaid Electronic Certification reads, in pertinent part:

> I (or the entity) have furnished or caused to be furnished the care, services and supplies itemized and done so in accordance with applicable federal and state laws and regulations.
>
> \*     \*     \*
>
> In submitting claims under this agreement I understand and agree that I (or the entity) shall be subject to and bound by all rules, regulations, policies, standards, fee codes and procedures of the New York State Department of Health as set forth in title 18 of the Official Compilation of Codes, Rules and Regulations of New York State and other publications of the Department, including Medicaid Management Information Systems Provider Manuals and other official bulletins of the Department.

E.     **The Medicare Advantage Program**

48.     Medicare Part C, or the Medicare Advantage Program, was enacted in 1997 and 2003 to provide an alternative to traditional Medicare by allowing individuals to receive their Medicare benefits from privately managed healthcare insurers, known as Medicare Advantage Organizations, instead of receiving their benefits directly from the federal government. *See* 42

U.S.C. § 1395w-21(a)(1). Persons who choose to enroll in Medicare Advantage Plans must be provided with the same benefits that are available to those enrolled in traditional Medicare. *See id.* § 1395w-22(a)(1)(A).

49.    Medicare Advantage Plans include Health Maintenance Organizations, Preferred Provider Organizations, Private Fee-for-Service Plans, Special Needs Plans, and Medicare Medical Savings Account Plans.

50.    Whereas traditional Medicare operates as a fee-for-service plan in which providers directly bill the federal government for reimbursement for specific services performed, Medicare Advantage Organizations are paid a set monthly reimbursement rate based on a formula established by CMS, pursuant to authority from the Secretary of HHS. *See* 42 U.S.C. § 1395w–23; 42 C.F.R. § 422.304. Medicare pays Medicare Advantage Organizations this set amount of money based on the health risk factors of their plans' enrollees, including their ages, disability statuses, genders, institutional statuses, and health statuses. *Id.*

**F.    The Federal Anti-Kickback Statute**

51.    The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population.  To protect the integrity of the program from these harms, which are difficult to detect, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality or care.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b,

Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

52.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare or Medicaid programs.  In pertinent part, the statute states:

(b) Illegal remuneration

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part under a Federal health care program, . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part under a Federal health care program, . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

53.    Violation of the statue can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

### G. Medicaid Managed Long-Term Care

54.     Pursuant to Title 19, section 1932 of the Social Security Act, in or about 1997,

New York established a Medicaid managed long-term care (MMLTC) program. MMLTC plans

receive a monthly capitation payment of approximately $3800 for each beneficiary they enroll.

55.     Each MMLTC provider, including VNSNY CHOICE, is required to enter into a

contract with the New York Department of Health which, along with federal and state law, sets

out the responsibilities of the MMLTC provider. *See* 2007 Model Contract (attached as Exhibit

A).

56.     In return for this premium, MMLTC providers are required to provide, among

other things, assistance with activities of daily living, care management services, skilled nursing

services, physical therapy, speech therapy, occupational therapy, nursing home care, and

preventive services such as dentistry, optometry, and podiatry. *See* 2007 MLTC Model Contract,

Article V, Article VI.A, & Appendix G.

57.     To be eligible for MMLTC, an applicant must, among other things, (1) be

determined eligible for Medicaid by the Local Department of Social Services ("LDSS"); (2) be

eligible for nursing home level of care (as of time of enrollment) as measured by the Semi-

Annual Assessment of Members ("SAAM"); (3) be capable of returning to or remaining in

his/her home and community without jeopardy to his/her health and safety; and (4) be expected

to require at least one of the following services covered by the plan and care management for at

least 120 days from the effective date of enrollment:

> (a) nursing services in the home;
> (b) therapies in the home;
> (c) home health aide services;
> (d) personal care services in the home;
> (e) adult day health care; or
> (f) social day care if used as a substitute for in-home personal care services

2007 MLTC Model Contract, Article IV.A.

58.     Although local department of social services are responsible for approving medical eligibility determinations before plan enrollment, the New York City Human Resources Administration does not make an independent home visit to confirm eligibility, but rather reviews the SAAM and plan of care provided by the MMLTC provider.

59.     The MMLTC provider is required to evaluate all applicants to assess (1) his/her eligibility for nursing home level of care, (2) his/her capability of returning to or remaining in his/her home and community without jeopardy to his/her health and safety, and (3) his/her need for the services listed above for at least 120 days from the effective date of enrollment. 2007 MLTC Model Contract, Article V.B.

60.     The MMLTC provider is required to conduct a comprehensive reassessment of all members *at least* every six months. 2007 MLTC Model Contract, Article V.J.5.

61.     Although the MMLTC provider is permitted to find that the applicant does not meet the eligibility criteria, the DOH contract specifically provides that the MMLTC provider "shall not discriminate against eligible Applicants on the basis of health status or need for health care services." 2007 MLTC Model Contract, Article V.B.5 & V.B.8.


## THE FRAUD SCHEMES

### A.     Background

62.     Palmieri is the President of VNSNY CHOICE. According to a 2012 Crains New York profile of Palmieri, when he became President in VNSNY CHOICE,

revenue was only $450 million. By 2012, Palmieri had increased the revenues of VNSNY CHOICE to $1 billion.

63.     On April 13, 2011, during an orientation of new employees, Palmieri claimed that he took VNSNY from a nursing agency and turned it into a billion dollar managed care company.

64.     Palmieri made similar remarks during a monthly VNSNY CHOICE staff meeting in the Fall 2011.

65.     VNSNY CHOICE operates both MLTC and Medicare Advantage Programs in New York State.

**B.     Unlawful Marketing and Kickbacks in its MLTC programs**

66.     The 2007 MLTC Model Contract permits providers to conduct marketing activities for potential enrollees consistent with 42 C.F.R. § 438.104, applicable state law and regulations. 2007 MLTC Model Contract, Article V.G.1.

67.     The Model Contract further requires providers to submit a marketing plan for approval, including a discussion as to if or how the provider plans to provide "nominal gifts" for the target population. 2007 MLTC Model Contract, Article V.G.3(h).

68.     MLTC providers are not permitted to "mislead, confuse [or] defraud Potential Enrollees." 2007 MLTC Model Contract, Article V.G.4(b); 42 C.F.R. § 438.104(b).

69.     The Model Contract specifically prohibits MLTC providers from offering monetary incentives to join the plan. 2007 MLTC Model Contract, Article V.G.4(j). Only nominal gifts of no more than $5.00 fair market value may be offered as part of promotional activities and only if made available to everyone regardless of whether they enroll. *Id.*

70.    In addition, 42 C.F.R. § 438.104(b) specifically prohibits MLTC providers from "directly or indirectly, engag[ing] in door-to-door, telephone, or other cold-call marketing activities."

71.    Notwithstanding these restrictions, Defendants hired salespeople who set up marketing points on the street and directly solicited individuals passing by.

72.    Moreover, Defendants' salespeople would target healthy individuals, who were not eligible for nursing home level of care as measured by the SAAM, to enroll as members.

73.    Further, in order to convince potential members to enroll in VNSNY CHOICE's managed long-term care plan, Defendants' salespeople offered passersby incentives in the form of telephone calling cards, trips to the Dominican Republic, out-of-town trips to casinos, and cash, if they completed enrollment forms.

74.    In addition, to convince potential members to enroll in VNSNY CHOICE's managed long-term care plan, Defendants' salespeople promised those individuals health care services, such as additional home health aide hours, that were not justified by the individual's SAAM. For example, VNSNY salespeople would ask prospective members how many hours of home health aide services they were receiving from their current managed care providers, and promised a higher number of hours if they enrolled in VNSNY CHOICE. However, once the member was enrolled in the VNSNY CHOICE program, the member's home health aide hours would be reduced.

75.    To incentivize its salespeople, VNSNY CHOICE employed a quota system. The salespeople on the street had a ten-member per-month quota. Relator was

told by a Marketing Representative that bonuses were paid to the salespeople based in part on whether or not they met their quota.

**C.     Unlawful Marketing and Kickbacks in its Medicare Advantage Programs**

76.     Medicare Advantage providers must also follow specific marketing guidelines. The New York Medicare Advantage model contract requires in Section 11.1 that the Medicare Advantage provider follow the marketing guidelines as set forth in Chapter 3 of CMS's Medicare Managed Care Manual.

77.     Medicare Managed Care Manual Chapter 3 Section 70.2 restricts promotional activities, including by prohibiting the use of health benefits and prohibiting discrimination in the promotional activity.

78.     Medicare Managed Care Manual Chapter 3 Section 70.6 prohibits marketing through unsolicited contacts including door-to-door solicitation and approaching beneficiaries in common areas.  Notwithstanding these restrictions, Defendants made unsolicited contact with potential members by setting up tables and vans to approach potential members in common areas such as sidewalks and parking lots.

79.     Defendants offered these potential enrollees free blood pressure checks, a health benefit, in violation of the marketing guidelines.

80.     Furthermore, Defendants only targeted minority neighborhoods, a violation of the prohibition of discrimination in promotional activities.

**D.     Cherry-Picking**

81.     As noted in paragraph 61 above, and as required by federal law, the DOH contract specifically provides that the MMLTC provider "shall not discriminate against eligible

Applicants on the basis of health status or need for health care services." 2007 MLTC Model Contract, Article V.B.8; 42 C.F.R. § 438.6(d)(3).

82.    The contract further provides that disenrollment of a member "may not be based in whole or in part on an adverse change in the Enrollee's health, or on the capitation rate payable to the Contractor. Disenrollment may not be initiated because of the Enrollee's high utilization of covered medical services, diminished mental capacity, or uncooperative or disruptive behavior resulting from his or her special needs except as may be established under subsection 5(a) of this Section." 2007 MLTC Model Contract, Article V.D.1(c); *seealso* Article V.5(a); 42 C.F.R. 438.56(b).

83.    However, the MLTC provider is required to disenroll a member if "an Enrollee is no longer eligible for nursing home level of care as determined at the last comprehensive assessment of the calendar year." 2007 MLTC Model Contract, Article V.D.4(g).

84.    Notwithstanding this requirement, Defendants failed to and/or refused to disenroll members who did not meet the requirement of being eligible for nursing home level of care as determined by the SAAM.

85.    Approximately twenty-five percent (25%) of the patients on Relator's case list were ineligible for Medicaid managed long-term care because they were too healthy or otherwise ineligible. Included in this group were (1) college students, (2) individuals running businesses (e.g., travel agencies), (3) individuals taking extended trips out of the country (e.g., to the Dominican Republic), (4) individuals able to travel out of town on gambling trips, and (5) individuals who were engaged in selling illegal drugs.

86.     Relator routinely complained to his superiors about the enrollment of these individuals, both at his weekly case review meetings and at monthly team and social worker meetings. Notwithstanding these frequent complaints, nothing was done to disenroll these individuals.

87.     Further, Defendants failed to disenroll members who were not receiving care because they were out of the country.

88.     In contrast, and in direct violation of federal and state regulations, Defendants took steps to disenroll members who requested additional home health aide hours, or who were discharged from a sub-acute stay.

89.     Relator was instructed by his supervisor to initiate discussions with family members of members who were on a sub-acute stay and say that it was very dangerous for them to take the members home, even when it was not. Relator was told on more than one occasion by his supervisor that it would be too expensive for VNSNY to have the member leave the nursing home because VNSNY would have to provide a 24-hour aide.

90.     To this end, Relator's supervisor instructed Relator and the nurse case manager to meet with the family at the nursing home to discuss disenrollment and urge them to have the disenrollment paperwork completed before the meeting.

E.      **Violations of Spend-Down Provisions**

91.     HRA determines financial eligibility for MMLTC plans using general Medicaid criteria (i.e., income no greater than $8,700 annually and savings no greater than $13,050). However, individuals whose income is higher than the rules allow may qualify for Medicaid through the Medicaid Excess Income program (the "Spend-Down" program), which allows

applicants with income over the Medicaid level, but with medical bills equal to their "excess income," to "spend down" their income to the financial resource limit.

92.     Under the 2007 MLTC Model Contract, capitation rates are adjusted to exclude an Enrollee's spenddown or Net Available Monthly Income ("NAMI") amounts as determined by the local department of social services. 2007 Model Contract, Article VI.J.

93.     The MLTC provider is required to bill its members for the spenddown amount. 2007 MLTC Model Contract, Article V.C.9.

94.     Enrollees are require to pay or make arrangements to pay the spenddown amount, within thirty days after such amount first becomes due. 2007 MLTC Model Contract, Article V.D.5.

95.     As set forth in the Defendants' Social Worker Training Manual, members enrolled in Medicaid managed long-term care "need to make timely and regular payments on their surplus to maintain eligibility in the program."

96.     Notwithstanding these rules, Defendants failed to make any attempts to collect the spend-down amounts or to take any action to disenroll members who failed to pay their spend-down amounts.

97.     When Relator would complain to his superiors that the spenddown amount was not being collected, he was told "it's not your problem, why are you worried about it?"

98.     However, beneficiaries who fail to pay their spenddown amount are no longer eligible for Medicaid long-term managed care.

**F.    False Billing of Medicare for Included Services**

99.    In return for the capitated amount paid to Defendants, Defendants were required to provide, among other things, assistance with activities of daily living, care management services, skilled nursing services, physical therapy, speech therapy, occupational therapy, nursing home care, and preventive services such as dentistry, optometry, and podiatry. *See* 2007 MLTC Model Contract, Article V, Article VI.A, & Appendix G.

100.    Notwithstanding this requirement, Defendants billed Medicare for rehabilitative services, such as physical therapy, that were supposed to be included in the Medicaid capitated rate.

101.    Such billing constitutes unlawful double-billing for the same services.

<u>COUNT I</u>
(All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(1) Presenting Claims
to Medicaid and Medicare for Capitated Payments for Beneficiaries Enrolled as a Result
of Violations of the Anti-Kickback Laws**

102.    Plaintiffs repeat and reallege ¶¶ 1 to 101 as if fully set forth herein.

103.    Defendants knowingly provided kickbacks or other illegal remuneration to induce Medicare and Medicaid beneficiaries to enroll in Defendants' Medicaid managed long-term care and Medicare Advantage programs.

104.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New York and the United States, including those claims for the capitated rate for beneficiaries who were induced to enroll in Defendants' Medicare Advantage and MLTC programs in violation of the Anti-Kickback laws.

105.   Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

106.   By virtue of the false or fraudulent claims made and caused to be made by defendants, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT II
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(2) Making or Using False
Records or Statements to Cause Claims to Be Paid
For Capitated Payments Received for Beneficiaries Enrolled
As a Result of Violations of the Anti-Kickback Laws**

107.   Plaintiffs repeat and reallege ¶¶ 1 to 106 as if fully set forth herein.

108.   Defendants knowingly provided kickbacks or other illegal remuneration to induce Medicare and Medicaid patients to enroll with Defendants for Medicare Advantage and Medicaid managed long-term care.

109.   Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the false certifications and representations made and caused to be made by Defendants, that the services were provided in compliance with all laws regarding the provision of health care services, including the Anti-Kickback laws – to get false or fraudulent claims paid or approved by the State of New York and the United States.

110.   By virtue of the false records or statements made and caused to be made by Defendants, the United States has suffered damages and therefore is entitled to treble

damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT III**
**(All Defendants)**

**False Claims Act, 31 U.S.C. § 3729(a)(3) Conspiring to**
**Submit False Claims in Connection with**
**Violations of the Anti-Kickback Laws**

111.     Plaintiffs repeat and reallege ¶¶ 1 to 110 as if fully set forth herein.

112.     Defendants conspired to defraud the United States by getting a false or fraudulent claim paid by Medicare and Medicaid, namely claims for the capitated rate for beneficiaries who were induced to enroll in Defendants' Medicare Advantage and MLTC programs in violation of the Anti-Kickback laws.

113.     By virtue of the conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT IV**
**(All Defendants)**

**False Claims Act, 31 U.S.C. § 3729(a)(7)**
**False Record to Avoid an Obligation to Refund Capitated**
**Payments Received in Violation of the Anti-Kickback Laws**

114.     Plaintiff repeats and realleges ¶¶ 1 to 113 as if fully set forth herein.

115.     Defendants made and used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States, namely capitated payments received for beneficiaries who were induced to enroll in Defendants' Medicare Advantage and MLTC programs in violation of the Anti-Kickback laws.

116.    Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

117.    By virtue of the false records or false statements made by Defendants, the United States suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT V
### (All Defendants)

### False Claims Act, 31 U.S.C. § 3729(a)(1) Presenting Claims to Medicaid for Capitated Payments Received as a Result of Cherry-Picking

118.    Plaintiffs repeat and reallege ¶¶ 1 to 117 as if fully set forth herein.

119.    Defendants knowingly enrolled and refused to disenroll Medicare and Medicaid beneficiaries who did not meet the eligibility requirements, such as being eligible for nursing home level of care as measured by the SAAM.

120.    In addition, in violation of legal and contractual prohibitions against basing disenrollment decisions on adverse changes in a beneficiary's health or the need for health services, Defendants disenrolled members who requested additional home health aide hours or who required additional care.

121.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New York, which claims were false in that they explicitly or impliedly represented that Defendants were in compliance with the anti-cherry-picking provisions of federal law and the DOH contract.

122.     Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

123.     By virtue of the false or fraudulent claims made and caused to be made by Defendants, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT VI**
**(All Defendants)**

**False Claims Act, 31 U.S.C. § 3729(a)(2) Making or Using False**
**Records or Statements to Cause Claims to Be Paid**
**for Capitated Payments Received as a Result of Cherry-Picking**

124.     Plaintiffs repeat and reallege ¶¶ 1 to 123 as if fully set forth herein.

125.     Defendants knowingly enrolled and refused to disenroll Medicare and Medicaid beneficiaries who did not meet the eligibility requirements, such as being eligible for nursing home level of care as measured by the SAAM.

126.     In addition, in violation of legal and contractual prohibitions against basing disenrollment decisions on adverse changes in a beneficiary's health or the need for health services, Defendants disenrolled members who requested additional home health aide hours or who required additional care.

127.     Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the SAAM and to false certifications and representations made and caused to be made by Defendants, that the services were provided in compliance with all laws and contractual provisions concerning anti-cherry-picking – to get false or fraudulent claims paid or approved by the State of New York and the United States.

128.    By virtue of the false records or statements made and caused to be made by Defendants, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT VII
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(3) Conspiring to
Submit False Claims for Capitated Payments
Received as a Result of Cherry-Picking**

129.    Plaintiffs repeat and reallege ¶¶ 1 to 128 as if fully set forth herein.

130.    Defendants conspired to defraud the United States by getting a false or fraudulent claim paid by Medicaid, namely claims for the capitated rate for beneficiaries who did not meet the eligibility requirements, such as being eligible for nursing home level of care as measured by the SAAM.

131.    In addition, Defendants conspired to defraud the United States by falsely representing that Defendants were in compliance with legal and contractual prohibitions against cherry-picking.

132.    By virtue of the conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT VIII
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(7)**
**False Record to Avoid an Obligation to Refund Capitated**
**Payments Received as a Result of Cherry-Picking**

133.    Plaintiff repeats and realleges ¶¶ 1 to 132 as if fully set forth herein.

134.    Defendants made and used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States, namely capitated payments received for beneficiaries who did not meet the eligibility requirements, such as being eligible for nursing home level of care as measured by the SAAM, and capitated payments received by falsely representing that Defendants were in compliance with legal and contractual prohibitions against cherry-picking.

135.    Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

136.    By virtue of the false records or false statements made by Defendants, the United States suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT IX
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(1) Presenting Claims**
**to Medicaid for Capitated Payments for**
**Beneficiaries Who Failed to Pay Their Spenddown Amounts**

137.    Plaintiffs repeat and realleges ¶¶ 1 to 136 as if fully set forth herein.

138.    Defendants knowingly failed to collect spenddown amounts or take any action to disenroll members who failed to pay their spenddown amounts.

139. Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New York and the United States, including those claims for the capitated rate for beneficiaries who failed to pay their spenddown amounts.

140. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

141. By virtue of the false or fraudulent claims made and caused to be made by defendants, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT X
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(2) Making or Using False
Records or Statements to Cause Claims to Be Paid for
Capitated Payments for Beneficiaries Who Failed to Pay Their Spenddown Amounts**

142. Plaintiffs repeat and reallege ¶¶ 1 to 141 as if fully set forth herein.

143. Defendants knowingly failed to collect spenddown amounts or take any action to disenroll members who failed to pay their spenddown amounts.

144. Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the false certifications and representations made and caused to be made by Defendants, that the services were provided in compliance with all laws regarding the provision of health care services, including those requiring the collection of spenddown amounts – to get false or fraudulent claims paid or approved by the State of New York and the United States.

145.     By virtue of the false records or statements made and caused to be made by

Defendants, the United States has suffered damages and therefore is entitled to treble damages

under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500

to $11,000 for each violation.

## COUNT XI
## (All Defendants)

### False Claims Act, 31 U.S.C. § 3729(a)(3) Conspiring to
### Submit False Claims in Connection with
### Capitated Payments for Beneficiaries
### Who Failed to Pay Their Spenddown Amounts

146.     Plaintiffs repeat and reallege ¶¶ 1 to 145 as if fully set forth herein.

147.     Defendants conspired to defraud the United States by getting a false or fraudulent

claim paid by Medicaid, namely claims for the capitated rate for beneficiaries who failed to pay

their spenddown amounts.

148.     By virtue of the conspiracy to defraud the United States, the United States

suffered damages and therefore is entitled to treble damages under the False Claims Act, in an

amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XII
## (All Defendants)

### False Claims Act, 31 U.S.C. § 3729(a)(7)
### False Record to Avoid an Obligation to Refund Capitated
### Payments Received for Beneficiaries Who Failed to Pay Their Spenddown

149.     Plaintiff repeats and realleges ¶¶ 1 to 148 as if fully set forth herein.

150.     Defendants made and used or caused to be made or used false records or

statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to

the United States, namely capitated payments received for beneficiaries who failed to pay their

spenddown amounts.

151.    Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

152.    By virtue of the false records or false statements made by Defendants, the United States suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### COUNT XIII
### (All Defendants)

### False Claims Act, 31 U.S.C. § 3729(a)(1)
### Billing Medicare for Services Included in Medicaid Rate

153.    Plaintiffs repeat and reallege ¶¶ 1 to 152 as if fully set forth herein.

154.    In return for the capitated amount paid to Defendants by Medicaid, Defendants were required to provide, among other things, assistance with activities of daily living, care management services, skilled nursing services, physical therapy, speech therapy, occupational therapy, nursing home care, and certain preventive services.

155.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to Medicare, for services that were required to be provided under Medicaid managed long-term care.

156.    In short, Defendants engaged in double-billing to Medicare and Medicaid for the same services.

157.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

158.    By virtue of the false or fraudulent claims made and caused to be made by defendants, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XIV
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(2) Making or Using False
Records or Statements to Cause Claims to Be Paid
By Medicare for Services Included in Medicaid Rate**

159.    Plaintiffs repeat and reallege ¶¶ 1 to 158 as if fully set forth herein.

160.    Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the false certifications and representations made and caused to be made by Defendants, that the services were provided in compliance with all laws regarding the provision of health care services – to get false or fraudulent claims paid or approved by Medicare for services that were required to be provided under Medicaid managed long-term care.

161.    By virtue of the false records or statements made and caused to be made by Defendants, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XV
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(3) Conspiring to
Submit False Claims in Connection with Claims to Be Paid
By Medicare for Services Included in Medicaid Rate**

162.　Plaintiffs repeat and reallege ¶¶ 1 to 161 as if fully set forth herein.

163.　Defendants conspired to defraud the United States by getting a false or fraudulent claim paid by Medicare, namely claims for services that were required to be provided under Medicaid managed long-term care and that were covered in the Medicaid capitated rate.

164.　By virtue of the conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XVI
### (All Defendants)

**False Claims Act, 31 U.S.C. § 3729(a)(7)
False Record to Avoid an Obligation to Refund Claims Payments
Received From Medicare for Services Included in Medicaid Rate**

165.　Plaintiff repeats and realleges ¶¶ 1 to 164 as if fully set forth herein.

166.　Defendants made and used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States, namely payments received from Medicare for services that were included in the Medicaid capitated rate.

167. Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

168. By virtue of the false records or false statements made by Defendants, the United States suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XVII
### (All Defendants)

### New York False Claims Act, N.Y. Fin. Law § 189(1)(a), Presenting Claims to Medicaid for Capitated Payments for Beneficiaries Enrolled as a Result of Violations of the Anti-Kickback Laws

169. Plaintiffs repeat and reallege ¶¶ 1 to 168 as if fully set forth herein.

170. Defendants knowingly provided kickbacks or other illegal remuneration to induce Medicare and Medicaid beneficiaries to enroll in Defendants' Medicaid managed long-term care programs.

171. Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New York, including those claims for the capitated rate for beneficiaries who were induced to enroll in Defendants' managed long-term care programs in violation of the Anti-Kickback laws.

172. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

173. By virtue of the false or fraudulent claims made and caused to be made by defendants, the State of New York has suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XVIII
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(b), Making or Using False Records or Statements to Cause Claims to Be Paid For Capitated Payments Received for Beneficiaries Enrolled As a Result of Violations of the Anti-Kickback Laws**

174.   Plaintiffs repeat and reallege ¶¶ 1 to 173 as if fully set forth herein.

175.   Defendants knowingly provided kickbacks or other illegal remuneration to induce Medicare and Medicaid patients to enroll with Defendants for Medicaid managed long-term care.

176.   Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the false certifications and representations made and caused to be made by Defendants, that the services were provided in compliance with all laws regarding the provision of health care services, including the Anti-Kickback laws – to get false or fraudulent claims paid or approved by the State of New York.

177.   By virtue of the false records or statements made and caused to be made by Defendants, the State of New York has suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XIX
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(c), Conspiring to Submit False Claims in Connection with Violations of the Anti-Kickback Laws**

178.   Plaintiffs repeat and reallege ¶¶ 1 to 177 as if fully set forth herein.

179.     Defendants conspired to defraud the State of New York by getting a false or fraudulent claim paid by Medicaid, namely claims for the capitated rate for beneficiaries who were induced to enroll in Defendants' Medicaid managed long-term care programs in violation of the Anti-Kickback laws.

180.     By virtue of the conspiracy to defraud the State of New York, New York suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XX
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(h) False Claims Act, False Record to Avoid an Obligation to Refund Capitated Payments Received in Violation of the Anti-Kickback Laws**

181.     Plaintiff repeats and realleges ¶¶ 1 to 180 as if fully set forth herein.

182.     Defendants made and used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New York, namely capitated payments received for beneficiaries who were induced to enroll in Defendants' managed long term care programs in violation of the Anti-Kickback laws.

183.     Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

184.     By virtue of the false records or false statements made by Defendants, the State of New York suffered damages and therefore is entitled to recovery as provided by the NYFCA of an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XXI
## (All Defendants)

### New York False Claims Act, N.Y. Fin. Law § 189(1)(a), Presenting Claims to Medicaid for Capitated Payments Received as a Result of Cherry-Picking

185.    Plaintiffs repeat and reallege ¶¶ 1 to 184 as if fully set forth herein.

186.    Defendants knowingly enrolled and refused to disenroll Medicare and Medicaid beneficiaries who did not meet the eligibility requirements, such as being eligible for nursing home level of care as measured by the SAAM.

187.    In addition, in violation of legal and contractual prohibitions against basing disenrollment decisions on adverse changes in a beneficiary's health or the need for health services, Defendants disenrolled members who requested additional home health aide hours or who required additional care.

188.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New York, which claims were false in that they explicitly or impliedly represented that Defendants were in compliance with the anti-cherry-picking provisions of federal law and the DOH contract.

189.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

190.    By virtue of the false or fraudulent claims made and caused to be made by Defendants, the State of New York has suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XXII
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(b), Making or Using False Records or Statements to Cause Claims to Be Paid for Capitated Payments Received as a Result of Cherry-Picking**

191.    Plaintiffs repeat and reallege ¶¶ 1 to 190 as if fully set forth herein.

192.    Defendants knowingly enrolled and refused to disenroll Medicare and Medicaid beneficiaries who did not meet the eligibility requirements, such as being eligible for nursing home level of care as measured by the SAAM.

193.    In addition, in violation of legal and contractual prohibitions against basing disenrollment decisions on adverse changes in a beneficiary's health or the need for health services, Defendants disenrolled members who requested additional home health aide hours or who required additional care.

194.    Defendants knowingly (i.e., with actual knowledge, in deliberate ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to be made or used, false records or statements – including but not limited to the SAAM and to false certifications and representations made and caused to be made by Defendants, that the services were provided in compliance with all laws and contractual provisions concerning anti-cherry-picking – to get false or fraudulent claims paid or approved by the State of New York.

195.    By virtue of the false records or statements made and caused to be made by Defendants, the State of New York has suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XXIII
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(c), Conspiring to Submit False Claims for Capitated Payments Received as a Result of Cherry-Picking**

196.    Plaintiffs repeat and reallege ¶¶ 1 to 195 as if fully set forth herein.

197.    Defendants conspired to defraud the State of New York by getting a false or fraudulent claim paid by Medicaid, namely claims for the capitated rate for beneficiaries who did not meet the eligibility requirements, such as being eligible for nursing home level of care as measured by the SAAM.

198.    In addition, Defendants conspired to defraud the State of New York by falsely representing that Defendants were in compliance with legal and contractual prohibitions against cherry-picking.

199.    By virtue of the conspiracy to defraud the State of New York, the State of New York suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XXIV
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(h), False Record to Avoid an Obligation to Refund Capitated Payments Received as a Result of Cherry-Picking**

200.    Plaintiff repeats and realleges ¶¶ 1 to 199 as if fully set forth herein.

201.    Defendants made and used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States, namely capitated payments received for beneficiaries who

39

did not meet the eligibility requirements, such as being eligible for nursing home level of care as measured by the SAAM, and capitated payments received by falsely representing that Defendants were in compliance with legal and contractual prohibitions against cherry-picking.

202. Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

203. By virtue of the false records or false statements made by Defendants, the State of New York suffered damages and therefore is entitled to recovery as provided by the NYFCA of an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

**COUNT XXV**
**(All Defendants)**

**New York False Claims Act, N.Y. Fin. Law § 189(1)(a), Presenting Claims**
**to Medicaid for Capitated Payments for**
**Beneficiaries Who Failed to Pay Their Spendown Amounts**

204. Plaintiffs repeat and reallege ¶¶ 1 to 203 as if fully set forth herein.

205. Defendants knowingly failed to collect spenddown amounts or take any action to disenroll members who failed to pay their spenddown amounts.

206. Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the State of New York, including those claims for the capitated rate for beneficiaries who failed to pay their spenddown amounts.

207. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

208. By virtue of the false or fraudulent claims made and caused to be made by defendants, the State of New York has suffered damages and therefore is entitled to treble damages under the NYFCA, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## COUNT XXVI
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(b), Making or Using False
Records or Statements to Cause Claims to Be Paid for
Capitated Payments for Beneficiaries Who Failed to Pay Their Spendown Amounts**

209.     Plaintiffs repeat and reallege ¶¶ 1 to 208 as if fully set forth herein.

210.     Defendants knowingly failed to collect spendown amounts or take any

action to disenroll members who failed to pay their spendown amounts.

211.     Defendants knowingly (i.e., with actual knowledge, in deliberate

ignorance of the truth, or with reckless disregard of the truth) made or used, or caused to

be made or used, false records or statements – including but not limited to the false

certifications and representations made and caused to be made by Defendants, that the

services were provided in compliance with all laws regarding the provision of health care

services, including those requiring the collection of spendown amounts – to get false or

fraudulent claims paid or approved by the State of New York.

212.     By virtue of the false records or statements made and caused to be made

by Defendants, the State of New York has suffered damages and therefore is entitled to

treble damages under the NYFCA, in an amount to be determined at trial, plus a civil

penalty of $6,000 to $12,000 for each violation.

## COUNT XXVII
### (All Defendants)

**New York False Claims Act, N.Y. Fin. Law § 189(1)(c), Conspiring to
Submit False Claims in Connection with
Capitated Payments for Beneficiaries
Who Failed to Pay Their Spendown Amounts**

213.     Plaintiffs repeat and reallege ¶¶ 1 to 212 as if fully set forth herein.

214. Defendants conspired to defraud the State of New York by getting a false or fraudulent claim paid by Medicaid, namely claims for the capitated rate for beneficiaries who failed to pay their spenddown amounts.

215. By virtue of the conspiracy to defraud the State of New York, the State of New York suffered damages and therefore is entitled to treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

**COUNT XXVIII**
**(All Defendants)**

**New York False Claims Act, N.Y. Fin. Law § 189(1)(h),**
**False Record to Avoid an Obligation to Refund Capitated**
**Payments Received for Beneficiaries Who Failed to Pay Their Spenddown**

216. Plaintiff repeats and realleges ¶¶ 1 to 215 as if fully set forth herein.

217. Defendants made and used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New York, namely capitated payments received for beneficiaries who failed to pay their spenddown amounts.

218. Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

219. By virtue of the false records or false statements made by Defendants, the State of New York suffered damages and therefore is entitled to recovery as provided by the NYFCA of an amount to be determined at trial, plus a civil penalty of $6,000 to $12,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the United States and the State of New York, demands and prays that judgment be entered in its favor against Defendants, jointly and severally, as follows:

1.     On the Counts under the False Claims Act treble the amount of damages sustained by the United States and civil penalties for each false claim or false statement, as provided by law; and

2.     On the Counts under the NYFCA treble the amount of damages sustained by the State of New York and civil penalties for each false claim or false statement, as provided by law; and

3.     For all Causes of Action alleged herein by Relator, all expenses and attorneys' fees related to this legal action, as provided by law; and

4.     Any other equitable relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator David Heisler,

hereby demands a trial by jury.

Dated:    New York, New York
           January 6, 2014

**YANKWITT & McGUIRE, LLP**

/s/

By: _____

Kathy S. Marks
Russell M. Yankwitt
140 Grand Street, Suite 501
White Plains, New York 10601
Tel: (914) 686-1500
Email: kathy@yankwitt.com

**LIDDLE & ROBINSON, L.L.P.**

By: _____

Andrea M. Paparella
800 Third Avenue
New York, New York 10022
Tel: (212) 687-8500
Email: apaparella@liddlerobinson.com